The public court of Illinois has convened. Thank you. You may be seated. Good morning, counsel. We're ready for our first case of the day, which is case number 416-0511. The people of the state of Illinois versus Chavs. Is it Reavill? Reavill. Reavill, okay. And we have for the people, we have Mr. McNeil, and for the defendant in this case, we have Mr. Zolk. You may proceed, counsel. Please support Mr. McNeil, Ms. Reavill. Counsel, February 21st, 2013 was the date that changed the lives of many people. That was the date when the defendant was told by his then wife that because LMR had a dance recital on Saturday, which would have been the 23rd of February, that she couldn't go to the Illinois Penn State basketball game that was scheduled that night. And instead suggested that CR go to the game with the defendant. I remember that night. The weather was terrible. I gave my season tickets to someone else because I didn't want to drive. On the other hand, they went to the game. The weather turned as bad as it was. And the defendant contacted Jody Reavill and said, it's really bad. And she said, well, why don't you get a hotel room with Cheyenne? This is a woman who testified at the trial that she was aware that, in fact, not only had the defendant molested her daughter, his stepdaughter, but also molested on the 18th of February and February 3rd of 2013, LMR. Throughout the trial, trial counsel Leon Parker attempted to get in evidence of the custody proceedings that were taking place, or could or might take place, but for these allegations. Judge Nancy Fahey denied that at every turn with the idea that it was unconnected to the case itself. Leon Parker, throughout the trial, attempted through various offers of proof to show that Jody was motivated by attempting to get custody of her children after she found out that the defendant was having an affair with a girlfriend. Judge Fahey denied that. And in the end, Bill Brozovich, the prosecutor, vehemently categorized it as the family law case had nothing to do with it. Well, the family law case itself, the dissolution, he is correct. On the other hand, the issue was the custody of Logan. Cheyenne was not going to be an issue because she was quickly going to turn 18 and be on her own. Well, she wasn't his child, right? That's correct. That's a good point. In any event, as these regressions occurred, Jody Revell, in a phone call, even said that she'd begin these proceedings and she didn't know how to stop them. Leon Parker attempted to introduce that evidence and was told that it was hearsay. Had the custody proceedings been admitted, it would have been, in fact, an admission of a party opponent and should have been allowed. Well, counsel, with your client's testimony, wasn't there evidence in the record regarding the argument, the possibility of a divorce, and the custody issue? Didn't that come into evidence? It came into evidence, but it was not corroborated. And that's essentially the problem. We have statements from young people, no physical evidence. This was the investigator, I think his name was Hogren, who's now working for Chief Justice Garment, that there was no physical evidence, there was nothing, there was a delay in reporting. These allegations didn't come to his attention until the divorce attorney notified him some two weeks after the fact. So when you say no corroboration, you mean no corroboration of the alleged sexual assault or no corroboration of what was going on in the family law case? Both. Had he been permitted to have the testimony about the custody proceedings and the effect of that, and the testimony supporting that from three different witnesses, Dale Gibaldi, who was a boyfriend of... He talked about the fact that she had planned to move out of the house, not that she indicated that she found this out and just scrambled to move out quickly. He testified that she had planned that prior to that, right? That's correct. But he couldn't elaborate it any further. He talked about the fact that she had allegedly found out that her husband had a girlfriend? Correct. But in answer to the question about the defendant's corroboration, had that more testimony been allowed than just his assertion, I think there would have been a different outcome. The next issue that I think is probably the most coincidental in time, given the circumstances, was the effect of Judge Nancy Fahey not inquiring from Prosecutor Bromley about the fact that her husband had a girlfriend. And Judge Fahey did not inquire from Prosecutor Bromley whether or not an offer had been made to the defendant. My involvement in the case began after Kevin Sanborn, the attorney at the sentencing hearing, was involved. And I attempted to advise both Judge Yarman, in a motion to substitute, and Judge Fahey in a motion to reconsider, that that needed to be addressed. As you may recall, the Missouri v. Frye case came out three years before, approximately 2012, I think. Its effect is unclear until your, Justice Steinman's, opinion in Williams. And this practice has begun in McLean County. It began in Vermillion County. The last trial I had, coincidentally, from Nancy Fahey. And the effect it would have had. Aside from what Missouri v. Frye talks about, is the ability for the sentencing judge to consider the value that the state put on the case. The offer that Mr. Brozovich made was probation to one count. Granted, it was rejected. At the sentencing hearing, had Judge Fahey known that, her decision could or might have been different. In addition to that, at the sentencing hearing, Cheyenne, who all counts about her, were found not guilty, was allowed to testify as a quote-unquote, victim. Even to the point to giving this extensive victim impact statement. Kevin Sanborn hardly crossed the examiner. The statement is replete with bad acts evidence. Now, I appreciate the fact that the government could have brought the bad acts in, but with evidence. Not a statement, without cross-examination, made in writing. No indication whether or not it was done completely by Cheyenne or not. Then she ties in to the abuse that he was found guilty of, with Logan. And that goes on and on and on. And then Jody's permitted to give a victim impact statement. How Jody is a victim is beyond me. The rest of the sentencing hearing was even further. And I've never encountered anything like this in 37 years. When Sanborn, his defense attorney, tells the judge what he said, and of a threatening nature. They call a recess. Massive numbers of deputies. Those of you who have been in Vermillion County, Judge Fahey's courtroom is very large. The deputies come in. All of the quote-unquote victims go into a corner. And somehow, Judge Nancy Fahey is not going to consider that. That is the height of ineffective assistance of counsel, and it certainly changed the outcome. The allegation that was proven was between two weeks in February, that there was some sexual conduct with a family member. But instead of considering a sentence towards the lower range, he gets 20 years. Honorably discharged from the military. No prior criminal history. The allegations of Cheyenne have been discredited by the jury. The only reason this case ever became a verdict was when Judge Fahey chose to give that instruction. And about 25 minutes later, the jury reached their conclusion. Perhaps a compromise given the rapidity of which it happened. But for the court to say now that somehow this sentencing hearing was fair and impartial, you've got the defense attorney disclosing evidence to the judge, and then the judge considering that immediately. Judge Fahey's practice, for those of you who may not know, is the defendant and counsel go right to the bench and speak directly to the judge for his right of allocution. And then she pronounced sentence. Mr. Rebel is an individual that expresses himself. He makes visual expressions. And she took that into account. Not only did she take into account at the sentencing hearing, she said he was smirking throughout the trial. Now to me, if that's not part of the record, I don't think the court can consider it. Facial expressions by litigants are not unusual. Nervousness, things of that nature, it doesn't necessarily mean disrespect to the court. So in all aspects of that sentencing hearing, Mr. Rebel was deprived of a fair and impartial sentencing. He did correct himself, but your honor, by that time the effect was there. But it was prior to sentencing. It was, it was. But keep in mind, we did have three females with deputies now over in the corner of the courtroom. I mean, that has to make an impact. But this is the judge. We're not talking about a jury imposing sentence. No question. That is true. Isn't that significant? I mean, as judges, we see all kinds of things and we learn to put them aside and only consider what's relevant and what's appropriate. I appreciate that. But she said specifically that he found she was disrespectful. In terms of his conduct during the trial and when witnesses were on the stand and the facial expressions that you were just referencing. Is there anything in the record indicating that she specifically indicated that she was considering the fact that his attorney had said that he was about to get upset and get violent? Other than her actions, calling in the deputies, but you're correct. The other part about this case was how and in what manner should the court consider victim impact statements. My experience in multiple counties now is that they're routinely given. Many, many times they're appropriate. Many, many times there's necessary. But it's unclear as to what truly is a victim. Statute says a victim of a violent crime. Well, does that mean that Jody Rebel was able to do that? I don't think so. Does that mean an acquitted case with a victim who was not believed by the jury or just the facts there is entitled to give a victim impact statement? I mean, the cumulative error here, both in the trial and in the sentencing, is undeniable. The requirement that motions to reconsider sentences be filed has been around for some time. But the rules and how they're supposed to be reconsidered would think that after this event, the sentencing hearing, either Judge Fahey should have recused herself and had another judge conduct a new sentencing hearing, or as we asked Judge Jarman to do, find that she was exercised a substitution for cause, which was denied. But if the opportunity to reconsider a sentence has any meaning, it should have had some meaning in this case. Something happened that shouldn't have happened. Kevin Sanborn should not have said what he did. Let's start over. It's only a sentencing hearing. But let's do it for the right reasons. Let's not get all these other factors resulting in a 20-year sentence. The state asked for 30 years, so I guess we should be thankful for that. But 20 years, two acts of misconduct with a 13-year-old between May, February the 3rd, and February the 18th, is not a 20-year sentence, particularly given the recent emphasis on courts to give probation. Granted, it was not a probationable offense, but the idea is let's take advantage of some of these community resources. Let's stop warehousing these people. The Department of Corrections and its ability to offer programs is there, but because his sentence was so significant, he can't even get those things over in western Illinois. Couldn't get them in Danville either, but the point is that there should have been some modest sentence. Granted, he deserved to be punished on the verdict, but this 20-year sentence is excessive, and I think I've pointed out areas where it was excessive. Unless there's other questions, that's what I have to say. I don't see any at this time. Thank you, counsel. You'll have time on rebuttal. Mr. Neal? May it please the Court, Counsel? As for the first argument, the trial court did not err in failing to inquire about any possible plea negotiations that took place. There's nothing in the record that indicates any plea negotiations ever did take place in this case. The only citation to any possible plea negotiations was the motion for bond on appeal, but that motion only presumed that negotiations existed. Is it a requirement? I would submit, and I argued in my brief, that it is not a hard, fast rule. Justice Steinman went over the pre-flight checklist thing in Williams. Of course, the distinguishing part of Williams is that there was evidence in the record of a concrete offer that counsel failed to relay to the defendant. Is it your position that Williams establishes basically a right of the defendant to require the trial court to inquire as to plea negotiations? I do not. I would submit that in that case, the issue was counsel erred in failing to relay a concrete negotiation or offer that was on the record to the defendant. That was the issue in Williams. Here, apparently, the argument is that the trial court in every criminal case in Illinois needs to ask before trial begins about any possible plea negotiations that might have taken place. Clearly, that is not a requirement. Williams does not make that a requirement. There was no error here. Assuming there was error, it was harmless beyond a reasonable doubt. The only prejudice the defendant points to, again, he does not argue that he would have taken a plea offer or that counsel failed to relay a plea offer to him. He only argues that his sentence would not have been as harsh. It is hard to fathom how a sentencing judge would take into account the existence of plea negotiations or rejected plea negotiations in fashioning a sentence. There is nothing in the record that indicates that the trial court did that in this case. Assuming error is harmless beyond a reasonable doubt. The next argument is the evidence of the divorce proceedings or custody proceedings being excluded. First, the defendant does not point to any actual evidence or points of evidence in the divorce proceedings that should have been included that were excluded. I think the state filed a motion in limine to begin with that excluded the custody proceedings. However, I think the theory that they were going for is the fact that the defendant's ex-wife had a motive to lie and fabricate. That was the theory they were going for. That is what counsel argued extensively in closing argument. She was mad that the defendant was cheating on her, therefore fabricating a case. Fabricating these allegations with LMR against the defendant. The jury heard all of this. The jury heard Dale Gabaudi testify about his ex-wife knowing about his girlfriend and planning on leaving the defendant. The jury heard his current wife testify that she was the girlfriend at the time that the defendant was still married to Jody Rebel. So there was corroboration as far as that is needed for the fact that Jody had a motive to lie or fabricate these allegations. Again, that was the main part of defense counsel's closing argument was this fabrication theory. The jury rightly found that was untrue, but that was the theory. As far as the other offers of proof, they were from people who didn't testify and they contained multilevel hearsay statements having to do with a phone call between one person and another person and then another person overhearing this phone call. Clearly, they were multilevel hearsay statements and they were by witnesses who never did testify. The next argument was ineffective assistance at sentencing. We have to put ourselves in the position of the attorney at the time that he made this statement. He tells the judge, the defendant is unhappy with me representing him. If I continue to represent him, he's going to make a commotion or a scene. He did this in the form of asking for a continuance, which the prosecution objected to. They granted a recess. When the recess comes back, counsel clarifies multiple times to the trial court, I misheard the defendant. Apparently it was probably a hushed courtroom setting. The defendant said he didn't want to make a scene or a commotion. The sentencing hearing went on without a hitch after that. This was not ineffective assistance. I would submit that this is exactly what counsel should have done at that time. The defendant was saying he didn't want counsel to represent him anymore. At least that's what counsel heard. I don't want you to represent me and if you do, I'm going to make a scene or a commotion. One, a defendant, however unwise it may be, has a right to represent himself. At that point, if counsel says nothing, the defendant has a colorable claim on appeal that his right to self-representation is violated. He has an obligation to inform the trial court that he doesn't want him to represent him anymore at that point. Second, from what he heard, although it was a miscommunication, at that point he thought there might be a commotion if he did continue to represent the defendant. For the safety of everyone involved, that's the responsibility of the counsel to let the trial court know and let everyone in the courtroom know that there may be a commotion. Even the defendant. The defendant might be the most likely one to get injured if he caused a commotion. If apparently there are a lot of bailiffs in the courtroom at the time. Again, it ended up being a miscommunication. However, counsel reiterated numerous times that it was a miscommunication. That he did mishear the defendant after the recess was taken. It was not objectively unreasonable for counsel to bring this to the trial court's attention at the time. What he thought he heard. The first prong of Strickland therefore fails. Also, the second prong clearly fails. The defendant wasn't prejudiced by this even if it was objectively unreasonable performance. The trial court never mentions any...a trial court would never...it would be hard for a trial court if they hear, oh, I'm sorry, I misheard that. Of course, any judge in their right mind is not going to take a miscommunication and attribute it to a defendant to fashion a harsher sentence. The only time trial court brings up the defendant's behavior is during trial in times where he took the trial lightly or was smirking and smiling. Clearly, the sentencing hearing was not one of those times where he was smirking and smiling if he didn't want counsel to represent him anymore and was angry enough to make a scene. This was not one of those times where he was supposedly smirking and smiling. Clearly, the trial court put no weight on this miscommunication as they shouldn't have. There was no prejudice either. Counsel clearly was not deprived of effective assistance of counsel. The final argument was the excessive sentence one. I'll just say that the range was 6 to 30. Defendant got 20. It's in the middle of the range, upper middle, two years above the median. It was within statutory limits. There were multiple aggravating factors that the trial court considered. Trial court also properly considered the mitigating factors and defendant was not improperly sentenced. Also, there was no improper evidence admitted at the sentencing hearing. CF testified, yes, defendant sexually assaulted me too for multiple years. It's well settled though. I mean, there was no conviction for CF. It's well settled. The evidentiary standards are much lower. At a sentencing hearing, I cited... I suppose she wouldn't, again, the evidentiary standards are lower. Right, but you could introduce evidence of other bad acts, but not total hearsay, can you? From somebody who has no personal knowledge? Well, I think hearsay is not directly barred. I understand that too, but when you're introducing evidence of other crimes, can it be done through a person who is not the victim of that crime? Or has no personal observations of the crime? I would say that it might have been improper for that to have gone on. It didn't prejudice the defendant, of course, at the time. The trial court actually doesn't mention the other bad acts when sentencing the defendant. The trial court only mentions the nature and circumstance of this offense, his position of trust and supervision over the victim, conduct causing or threatening serious harm, and a deterrence factor as a statutory aggravating factor. Were any objections raised at the sentencing hearing? No. I think there was an objection for CF's testimony. The victim that testified. Was it testimony or was she reading a statement? No, she was subject to cross-examination, as was Jody. She did both, right? She read a statement and then she testified. The cross-examination, I wouldn't see why the context of the victim impact statement wouldn't be subject to cross-examination as well. I don't know if the counsel went into it, but she was subject to cross-examination. As was Jody, which I'm guessing one of the questions would be, do you have any personal knowledge of this action? But the point is that other criminal conduct, even when the defendant isn't charged with anything, is routinely allowed in and is not, again, prejudiced. There's nothing in the record that suggested the trial court even considered the other bad acts evidence in sentencing the defendant. He got a sentence in the middle of the range. And I would submit that if the trial court did consider the bad acts, of course the CF testimony and statement was much stronger evidence than, again, a third-party allegation from Jody. So I would say if the trial court took into consideration any of the other bad acts that weren't charged, it would have been CF allegations. And there was no improper factors considered by the trial court. The defendant's sentence was not accepted. If there are no questions, I thank the Court. Thank you, Counsel. Any rebuttal, Counsel? The people indicated that there was no reference in the record to the probationary offer. I would suggest on C-226, the common law record, my motion for substitution of Judge Fahey clearly cites that and was unrefuted. And the aspect about this being part of the record, both in Williams and in Missouri v. Frye, the allegation is my attorney never told me about the government's offer. Well, these are post-conviction petitions. This is the defendant saying, well, there's no evidence in the record of those cases either. So the ability to prove or disprove the existence of an offer is difficult. However, to the best extent we could, we did prove it. And as I said, it's in the record. But did you allege that it wasn't communicated to your client? No, we did not allege that, Your Honor. That was not the case. We're not suggesting that. The sole harm here is that, alleged, is that if the trial court heard the plea offer, that would have mitigated her sense of what sentence to impose? It would have been a factor, yes. How is that a factor? How can that ever be a legitimate factor for the trial court to entertain what the plea bargaining may have been and then decide, I'm going to let that affect the sentence I'm going to impose? It's a factor in the aspect that you should not consider a trial as something that requires a different sentence. If the government called the case... So this is a jury tax the court is imposing? That's correct. And therefore, a plea offer sets the minimum or sets the standard by which a sentence should be imposed? It is a factor. But here, this was not a probationable offense, so apparently there was going to be some type of amendment if probation was being talked about. So that seems to take it even more out of the realm of consideration for the trial court. Williams discussed the reasons for it. Did it make any reference to this factor as you cite? It did not. I think it's an evolving standard, much like the aspect of reconsidering sentences, something that as a prosecutor I never did. And we have this case comes out, Missouri v. Frye, and everybody reexamines it. Who would be more efficient? Who would be more fair? Who would be fundamentally just if we do this? How this is eventually going to happen, no one knows. On the other hand, I think it's a factor. It should be the ability for both sides, prosecution and defense, to have some sense of what the penalty is for certain cases. To go from probation to a 20-year sentence is massively out of bounds. He couldn't have given him probation. No, I understand that, but six years. Six years, no prior criminal offense, only one victim, two weeks of proven abuse. I want to direct one other aspect about this. Counsel said that there was some cross-examination, and this is in my reply brief. CF, her victim impact statement goes on for three pages, single-spaced. Two pages of questions by Mr. Sandberg. LMR, not as long victim impact statement, two questions of her. One of which was, are you still attending counseling? How in the world does that in any way help the defendant's sentence to be mitigated? And lastly, the examination of Jody Rubell was a little bit more extensive, but instead of focusing on the custody issue, he asked about the disillusion matter. Judge Fahey corrects him about the grounds for disillusion. Now, in fairness to Kevin Sandberg, he just left the McLean County State's Attorney's Office, so there's no reason he would have known that because he didn't do a lot of civil law. And then lastly, the seven-year allegation, which I think Justice Pope mentioned. Now, one question. Who was this? When did it happen? Was it reported to the police? Was there any prosecution? Is there any record of all that this happened? We've established, perhaps, that Jody is vengeful. But Jody telling this on cross-examination. Now, my suggestion is, and I can't say for sure, is that the interaction, and counsel's correct, Mr. Sandberg corrected what was said. He got off strike. He was totally off pace. No real argument about statutory factors of mitigation. No witnesses presented, some character letters, but character letters are pretty routine. And the core issue of, is this man a pedophile, was left unchallenged. Counsel, I'm sorry. You're out of time. Thank you very much. We'll take the matter under advisement and be in recess until the next case.